UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
B. LEWIS PRODUCTIONS, INC.,          :
                                     :
                Plaintiff,           :      01 Civ. 0530 (MBM)
                                     :
        -against-                    :      OPINION & ORDER
                                     :
MAYA ANGELOU and HALLMARK            :
CARDS, INCORPORATED,                 :
                                     :
                Defendants.          :
----------------------------------X

APPEARANCES:

JETHRO M. EISENSTEIN, ESQ.
(Attorney for plaintiff)
Profeta & Eisenstein
14 Wall Street, 22nd Fl.
New York, NY 10005-2101
(212) 577-6500

MARTIN R. GOLD, ESQ.
JACOB INWALD, ESQ.
(Attorneys for defendant Angelou)
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700

NORMAN C. KLEINBERG, ESQ.
DANIEL H. WEINER, ESQ.
LORI A. MASON, ESQ.
(Attorneys for defendant Hallmark)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff B. Lewis Productions, Inc. (BLP) sues defendant Maya Angelou for breach of contract and breach of the duty of good faith and fair dealing. BLP also sues defendant Hallmark Cards, Inc. for tortious interference with BLP's alleged contract with Angelou. As an alternative to its breach of contract claim against Angelou, BLP asserts a quantum meruit claim for services BLP performed in Angelou's interest for which BLP was not compensated. Jurisdiction is based on diversity of citizenship. Defendants Angelou and Hallmark move for summary judgment. For the reasons set forth below, both motions are denied.

I.

A. Procedural History

This court dismissed the complaint in this case in 2003, granting summary judgment in favor of defendants Angelou and Hallmark on the ground that no joint venture or exclusive agency arrangement between BLP and Angelou existed. B. Lewis Prods., Inc. v. Angelou, No. 01 Civ. 530, 2003 U.S. Dist. LEXIS 12655 (S.D.N.Y. July 23, 2003). On appeal, the Second Circuit affirmed the holding that no joint venture or exclusive agency agreement had been created between BLP and Angelou, but remanded the case and directed me to consider whether a simple bilateral

contract between the parties had been created, and whether, even absent a bilateral contract, BLP was entitled to a quantum meruit recovery. <u>B. Lewis Prods., Inc.</u> v. <u>Angelou</u>, No. 03-7864, 99 Fed. Appx. 294, 2004 U.S. Dist. LEXIS 10088 (2d Cir. May 21, 2004). For the reasons explained below, whether there is a bilateral contract between the parties presents at least a triable issue.

B.  Factual History

Although familiarity with the facts in this case can be assumed, as they were set forth in detail in the court's previous opinion, <u>B. Lewis Prods.</u>, 2003 U.S. Dist. LEXIS 12655, at *2-*15, a brief recapitulation is necessary to provide context for this decision.

Butch Lewis is the president and sole owner of plaintiff corporation B. Lewis Productions, Inc.  BLP's business consists primarily of promoting boxing and other sports and entertainment events.  Defendant Maya Angelou, a resident of North Carolina, is a renowned poet.  Defendant Hallmark Cards, Incorporated, a Missouri corporation, manufactures greeting cards and related products.  In this action, BLP claims that Angelou breached an agreement in which she granted BLP the exclusive right to exploit her original literary works for publication in greeting cards and similar products.  Angelou claims that no enforceable contract existed.  BLP claims also that Hallmark

tortiously interfered with its contract with Angelou.

Lewis and Angelou became acquainted in early 1994 when, at Lewis's request, Angelou visited Mike Tyson at an Indiana prison. (Hallmark 56.1 Statement ¶ 6) At that meeting, Angelou and Lewis discussed how she might reach a broader base of readers by publishing her works in greeting cards. (Lewis Dep. at 75-78) Several months after this initial meeting, Lewis met with Angelou at her North Carolina home to discuss a potential collaboration between Angelou and BLP to market Angelou's works to greeting card companies. (Hallmark 56.1 Statement ¶ 7) In November 1994, Lewis and Angelou signed a "letter agreement" that established what the letter called a "Joint Venture" to publish Angelou's writings in greeting cards and other media forms. The letter agreement, dated November 22, 1994 and signed by both parties, reads as follows:

> This letter agreement made between B. LEWIS PRODUCTIONS, INC. (BLP) with offices at 250 West 57th Street, New York, N.Y. 10019 and MAYA ANGELOU (ANGELOU) whose address is 2720 Reynolda Road, Suite #1, Winston-Salem, NC 27106, sets forth the understandings of the parties with reference to the following:
>
> 1. The parties will enter into a Joint Venture (Venture), wherein ANGELOU will exclusively contribute original literary works (Property) to the Venture and BLP will seek to exploit the rights for publishing of said Property in all media forms including, but not limited to greeting cards, stationery and calendars, etc.
>
> 2. BLP will contribute all the capital necessary to fund the operation of the Venture.

3

3. ANGELOU will contribute, on an exclusive basis, original literary works to the Venture after consultations with and mutual agreement of Butch Lewis, who will be the managing partner of the Venture.

4. The Venture shall own the copyrights to all of ANGELOU's contributions to the Venture.
　　　(a) If any of the subject copyrights do not produce any income for a consecutive five (5) year period as a result of the exploitation referred to [in] paragraph 1 herein then the ownership of these copyrights shall revert to Angelou exclusively.

5. The name of the Venture shall be mutually agreed upon.

6. Gross Revenue shall be distributed and applied in the following order:
　　　(a) Return of BLP's capital contribution.
　　　(b) Reimbursement of any and all expenses of the Venture.
　　　(c) Balance (net profits) to be shared equally between BLP and ANGELOU.
　　　(d) ANGELOU shall have the right at any time, upon reasonable notice, to inspect all records including but not limited to the financial records of the Venture.

This Agreement shall be binding upon the parties until a more formal detailed agreement is signed.

(Inwald Aff., Ex. F)

In late 1994,[1] BLP began to market Angelou's work to Hallmark and several other greeting card companies. Lewis began to negotiate a license agreement with Hallmark on Angelou's

---

[1] Lewis began promoting Angelou's work to Hallmark even before the November 22, 1994 Agreement was signed. Lewis and his associate Joy Farrell met with Hallmark executives on November 11, 1994 to discuss a line of greeting cards featuring Angelou's work. (Angelou 56.1 Statement ¶ 14)

behalf.  When Hallmark asked Lewis for confirmation that he was

indeed authorized to act on Angelou's behalf, on June 19, 1996,

Lewis sent Hallmark a letter signed by Angelou that stated:

> This will confirm that BUTCH LEWIS PRODUCTIONS,
> INC. (BLP) has the exclusive right to represent DR.
> MAYA ANGELOU for the exploitation of her work product
> in the area of greeting cards, stationery, calendars,
> etc. as per the contract executed by BLP and Dr.
> Angelou dated November 22, 1994 which is still in full
> force and effect.

(Inwald Aff., Ex. G)  BLP declined to send Hallmark the November

22, 1994 agreement itself because Lewis wanted to keep its terms

confidential.  (Lewis Dep. at 118-19)

In March 1997, after extended negotiations, Hallmark

sent BLP a license agreement for the use of Angelou's future

exclusive works which would have paid her and BLP 9% of gross

revenues from sales of licensed products, with a $50,000 advance

payment and a guaranteed minimum $100,000 in royalties. (Am.

Compl. ¶ 16; Weiner Aff., Ex. Q; Hallmark 56.1 Statement ¶ 21)

Angelou's greeting cards would be administered through Hallmark's

Ethnic Business Center.  (Angelou 56.1 Statement ¶ 17; Weiner

Aff., Ex. Q)

Also in March 1997, Lewis and Angelou encountered one

another at an event in Las Vegas, where Angelou saw Lewis, who is

black, punctuate a conversation with white people by grabbing his

crotch.  (Angelou Dep. at 114-15; Lewis Dep. at 151-53)  After

she witnessed Lewis's behavior, Angelou "burned up his ears."

(Angelou Dep. at 113)  She claims that she told him that the "venture" between them was off, and that she no longer wanted to work with him.  (Angelou Dep. at 113)  Lewis denies that Angelou made any such comment at the time.  (Lewis Dep. at 152-53)

However, when Lewis forwarded the Hallmark license agreement to Angelou, she did not sign it, and later told her literary agent Helen Brann to "start putting a little cold water on the prospect of this deal with Hallmark."  (Brann Dep. at 34)  After meeting with Lewis and his associate Joy Farrell, Brann sent a letter to Lewis on May 5, 1997, informing him "that it is not going to work out now for Dr. Maya Angelou to make any deal with Hallmark Cards."  (Inwald Aff., Ex. R)  In her letter, Brann cited Angelou's commitment to Random House as the publisher of all of Angelou's "major work" as a reason for not proceeding with Hallmark.  Brann noted that "[n]either Dr. Angelou nor I like to say never, and I suppose that sometime in the future we might all figure out a way, in cooperation with Random House and Hallmark and us, to launch some kind of greeting card program, but this year is definitely not the year to contemplate such a move." (Id.)

Lewis claims that at a later meeting in 1997, Angelou told him that she would sign the licensing agreement with Hallmark "after the New Year," and that in February 1998, she told him she was planning to sign the agreement "as soon as she

[got] everything off her table." (Lewis Dep. at 144-50) However Angelou did not sign the Hallmark licensing agreement,[2] and according to Lewis's associate Farrell, when Farrell left BLP in mid-1998, in her opinion the deal was "dead," and the project was over. (Farrell Dep. at 252-53) Additionally, because Hallmark did not hear from Lewis after it sent him the licensing agreement in 1997, Hallmark executives eventually concluded that the collaboration between BLP and Angelou was "dead." (Glass Dep. at 33-34; Gfeller Dep. at 11-13)

Hallmark wrote Angelou's agent Brann in March 1998 to inquire whether Angelou was still interested in pursuing a program of greeting cards, stating that its "discussions with Mr. Lewis ended in early 1997 when he could not deliver a program." (Inwald Aff., Ex. U) Brann responded that Angelou was not interested in entering into an agreement with Hallmark at that time. (Inwald Aff., Ex. V) However, in June 1999, Angelou's close friend Amelia Parker, who was acquainted with an executive at Hallmark,[3] convinced Angelou to have lunch with Hallmark executives at the company's St. Louis headquarters when Angelou

---

[2] Angelou declined also to sign a more formal version of the November 22, 1994 letter agreement between her and BLP that Lewis forwarded to her in 1997. (Inwald Aff., Ex. Q)

[3] Parker and Marquetta Glass, a Hallmark executive, were acquaintances and had corresponded in May, 1999 about exploring a "partnership" between Hallmark and Angelou. (Eisenstein Exs. 12, 17)

was in town for an unrelated speaking engagement. (Angelou 56.1 Statement at ¶ 30) Angelou was encouraged by this meeting and decided to try to arrange a licensing deal with Hallmark. (Id. ¶ 33)

Simultaneously, Angelou sought to assure that her ties to Lewis were severed. On June 16, 1999 Angelou's North Carolina counsel sent a letter to BLP stating that "any business relationship that you may have had or contemplated pursuant to a letter dated November 22, 1994 from you to Dr. Angelou, has been terminated." (Inwald Aff., Ex. X) Lewis claims that he never received this letter, and that as far as he was concerned, the November 1994 letter agreement was still in force in 1999. (Lewis Dep. at 159-161) According to Lewis, he contacted Angelou in 1999 about the Hallmark licensing agreement and she put him off again; at this point Lewis stopped trying to communicate with Angelou about Hallmark, and instead kept abreast of her views on the matter by communicating with her close friend Bob Brown, who did not tell Lewis that the "venture" had been terminated. Lewis learned that Hallmark and Angelou had reached an agreement without his assistance when he saw a press release about the deal in November 2000. (Eisenstein Ex. 11 at ¶ 17; Lewis Dep. at 150-52)

On June 28, 2000, after more than a year of negotiations and discussions, Hallmark and Angelou signed a

licensing agreement which featured a sliding royalty scale based on net revenues, guaranteed Angelou a minimum payment of $2 million, and gave her a $1 million advance. This agreement allowed Hallmark to use Angelou's previously published work as well as future works she would create for the project; additionally, the marketing of Angelou's products would not be restricted to ethnic consumers. (Inwald Aff., Ex. Z)

## II.

In its initial opinion in this case, this court held that under both New York and North Carolina law, the parties intended to form a binding agreement. <u>BLP Prods.</u>, 2003 U.S. Dist. LEXIS 12655 at *19-*31. The court held also that the parties' intended agreement could not be enforced because although it was styled a joint venture, it lacked the required legal characteristics of a joint venture. <u>Id.</u> at *32-45. Finally, the court determined that the agreement between the parties could not reasonably be characterized as an exclusive agency agreement because neither party had viewed it as such. <u>Id.</u> at *44-46. Now, the court must determine whether the November 22, 1994 letter agreement between Angelou and BLP (the Agreement) -- although neither a joint venture nor an exclusive agency agreement -- is a simple bilateral contract. BLP did not argue in its initial motion that the Agreement could be so

characterized, but our Circuit pointed out that the nature of an agreement is not limited by the label affixed to it. <u>B. Lewis Prods.</u>, 2004 U.S. App. LEXIS 10088, at *7 (citing <u>City of New York</u> v. <u>Pennsylvania R.R. Co.</u>, 37 N.Y.2d 298, 300, 372 N.Y.S.2d 56, 58 (1975)).

In her motion for summary judgment, Angelou claims that as a matter of law, no bilateral contract existed between her and BLP because the Agreement was vague, indefinite, and lacking in essential terms. In determining whether to grant a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party, here BLP, and draw all reasonable inferences in its favor. <u>Huminski</u> v. <u>Corsones</u>, 396 F.3d 53, 69-70 (2d Cir. 2004). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). The court finds that there is at least an issue of fact as to whether the Agreement was sufficiently definite to constitute a contract, with the result that it gave rise to good-faith obligations of performance by both BLP and Angelou.[4]

---

[4] As was the case the first time this matter was before the court, Angelou claims that her dispute with BLP should be governed by North Carolina law, and BLP claims that the case should be governed by New York law. However, when there is no material difference between the applicable laws of the states

A.  Definiteness and Essential Terms

"In order for an agreement to be enforced, it must be sufficiently 'definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty.'"  _Best Brands Beverage, Inc._ v. _Falstaff Brewing Corp._, 842 F.2d 578, 587 (2d Cir. 1987) (quoting _Candid Prods., Inc._ v. _Int'l Skating Union_, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)) (alteration in original); _Brawley_ v. _Brawley_, 87 N.C. App. 545, 549, 361 S.E.2d 359, 361 (1987); _see also_ 1 Corbin on Contracts § 4.1 ("A court cannot enforce a contract unless it can determine what it is.  It is not enough that the parties think that they have made a contract.  They must have expressed their intentions in a manner that is capable of being understood.  It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can

_____

involved, the court need not decide the choice of law issue and may apply New York law.  _Fieger_ v. _Pitney Bowes Credit Corp._, 251 F.3d 386, 393 (2d Cir. 2001); _see also_ _BLP Prods._, 2003 U.S. Dist. LEXIS 12655, at *18-*19; _Secured Capital de Mexico_ v. _Midland Credit Corp._, No. 02 Civ. 2434, 2003 U.S. Dist. LEXIS 154, at *9-*10 (S.D.N.Y. Jan. 7, 2003); _Allstate Ins. Co._ v. _Solarz_, 81 N.Y.2d 219, 223-26, 597 N.Y.S.2d 904, 905-07 (1993).  The fundamental principles of contract law discussed below are valid in both New York and North Carolina, therefore the court need not conduct a choice of law analysis to decide Angelou's motion.

determine what the terms of the agreement are.").

Moreover, an agreement cannot be enforced if it lacks essential terms, and if the court is unable to supply such missing terms in a reasonable fashion that is consistent with the parties' intent. <u>Best Brands</u>, 842 F.2d at 588; <u>Helms</u> v. <u>Prikopa</u>, 51 N.C. App. 50, 55, 275 S.E.2d 516, 519 (1981); <u>see also</u> Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

A court may not "rewrite the contract and impose liabilities not bargained for." <u>A/S Atlantica</u> v. <u>Moran Towing & Transp. Co.</u>, 498 F.2d 158, 161 (2d Cir. 1974) (internal quotation marks omitted); <u>Woods</u> v. <u>Nationwide Mut. Ins. Co.</u>, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978). However, New York and North Carolina courts are reluctant to strike down contracts for indefiniteness. <u>See</u> <u>Lee</u> v. <u>Joseph E. Seagram & Sons, Inc.</u>, 552 F.2d 447, 453 (2d Cir. 1977); <u>Gonzalez</u> v. <u>Don King Prods.</u>, 17 F. Supp. 2d 313, 314-15 (S.D.N.Y. 1998) (holding that refusing to enforce a contract as indefinite and meaningless "'is at best a last resort'") (quoting <u>166 Mamaroneck Ave. Corp.</u> v. <u>151 E. Post Rd. Corp.</u>, 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 688 (1991)); <u>Goodyear</u> v. <u>Goodyear</u>, 257 N.C. 374, 379, 126 S.E.2d 113, 117

(1962) ("Where . . . the parties have attempted to put in writing an agreement fixing the rights and duties owing to each other, courts will not deny relief because of vagueness and uncertainty in the language used, if the intent of the parties can be ascertained.").  Courts are cautioned not to turn the requirements of definiteness and essential terms into a fetish, because

> at some point virtually every agreement can be said to
> have a degree of indefiniteness, and if the doctrine is
> applied with a heavy hand it may defeat the reasonable
> expectations of the parties in entering into a
> contract.  While there must be a manifestation of
> mutual assent to essential terms, parties also should
> be held to their promises and courts should not be
> pedantic or meticulous in interpreting contract
> expressions.

Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923 (1989) (internal quotation marks omitted).

A term is essential if "it seriously affects the rights and obligations of the parties and there is a significant evidentiary dispute as to its content."  Ginsberg Machine Co. v. J. & H. Label Processing Corp., 341 F.2d 825, 828 (2d Cir. 1965). Terms that may be considered essential in any agreement include the price to be paid, the work to be done, and the time of performance.  See 1 Williston on Contracts §4.18; Schenk v. Red Sage, No. 91 Cv. 7868, 1994 U.S. Dist. LEXIS 399, at *35 (S.D.N.Y. Jan. 20, 1994).  When a court encounters indefinite

terms, but finds that the parties did intend to form a contract, as the court found in its first decision in this case, the court then must attempt to "attach a sufficiently definite meaning to [the] bargain."  1 Williston § 4.18.  A court should be especially willing to do so if the plaintiff has fully or partly performed under the agreement "since the performance may either remove the uncertainty or militate in favor of recovery even if the uncertainty continues."  Id. (citing Restatement (Second) of Contracts § 34)); see also 1 Corbin § 4.1 ("The fact that one [party], with the knowledge and approval of the other, has begun performance is nearly always evidence that [the parties] regard the contract as consummated and intend to be bound thereby.").

Of course, the court may not make a contract for the parties, see 1 Corbin § 4.1.  However, because the parties in this case did intend a contract, the court is obligated to fill any gaps their Agreement contains, if it reasonably is able to do so.  Voiding an agreement for lack of essential terms "is a step that courts should take only in rare and extreme circumstances." Shann v. Dunk, 84 F.3d 73, 81 (2d Cir. 1996).

Angelou claims that the Agreement in this case is unenforceable because it lacks multiple essential terms.  She notes that the Agreement does not specify or describe: what "original literary works" she would be contributing to the project; whether these literary works would be new or chosen from

her previously published works; the quantity of works Angelou was to produce; when she was to contribute these works; the duration of the Agreement; or the extent of BLP's substantive or financial obligations under the Agreement. (Angelou Br. at 19) Further, Angelou argues that the Agreement's designation of BLP's right to exploit Angelou's work in "all media forms" is overbroad and does not express the parties' intent, because this provision would have affected Angelou's agreement with her literary publisher Random House. Id. at 20. As explained below, these allegedly indefinite or missing terms are capable of reasonable interpretation.

1. Price

The general rule is that price is "an essential ingredient" of every contract, and that a compensation clause is enforceable only if payment can be determined from the agreement without any "further expression by the parties." Van Diepen v. Baeza, No. 96 Cv. 8731, 1998 U.S. Dist. LEXIS 5763, at *21-*22 (S.D.N.Y. Feb. 26, 1998) (internal quotation marks omitted); see also, e.g., N.C. Coastal Motor Line, Inc. v. Everette Truck Line, Inc., 77 N.C. App. 149, 151, 334 S.E.2d 499, 501 (1985). Angelou notes that the Agreement does not state how much capital, if any, BLP was obligated to contribute to the project, and argues that this constitutes a failure to specify the essential term of

price. (Angelou Br. at 20) The Agreement does state, however, that BLP will contribute "all the capital necessary." The Agreement further specifies how gross revenue generated by the "Venture" was to be distributed: BLP's capital is returned, any of the Venture's expenses are reimbursed, and any net profits are shared equally between BLP and Angelou. (Inwald Aff., Ex. F) There is at least a material question of fact as to whether this payment and distribution scheme was sufficiently definite. BLP was obligated under the Agreement to contribute "all" capital –– an arrangement with a meaning that arguably is capable of enforcement. Moreover, the capital necessary to a "Venture" of the sort at issue here would be modest, if indeed any capital expenditures would have been necessary. Even expense items were likely to be limited to funds required to produce greeting card mock-ups, postage, and perhaps some travel.

If Angelou had signed the Hallmark license agreement that Lewis had negotiated on her behalf, and if revenue had been generated from Angelou's line of greeting cards, the Agreement between BLP and Angelou would have provided clear guidelines for distribution of that revenue. A compensation clause need not specify dollar figures to be definite. Arbitron, Inc. v. Tralyn Broad., Inc., 400 F.3d 130, 2005 U.S. App. LEXIS 3724, at *14-*18 (2d Cir. 2005) (citing Cobble Hill, 74 N.Y.2d at 483, 548 N.Y.S.2d at 923).

BLP's part performance too shows that the parties had a meeting of the minds on the financial aspects of the Agreement. See Restatement (Second) of Contracts § 34; 1 Corbin § 4.1. BLP paid all initial expenses as Lewis began to negotiate licensing deals with various greeting card companies, and Angelou raised no objection during that time.

The price terms of the Agreement are capable of reasonable interpretation, and therefore arguably are sufficiently definite for enforcement.

2. Duration

Angelou claims also that the Agreement's lack of a duration term renders it too vague for enforcement. (Angelou Br. at 23, 28-29) Indeed, in his deposition, Lewis admitted that "[t]here was no time set" on the Agreement. (Lewis Dep. at 154) The parties dispute whether the Agreement's copyright provision contains an implicit duration term. However, the court need decide this issue because the Agreement's lack of a duration term is not material.

Under both New York and North Carolina law, a duration clause is not necessary in a contract for services. If such a contract makes no provision for duration, the contract is presumed to be terminable at will. See Bishop v. Wood, 426 U.S. 341, 346 (1976) (citing Still v. Lance, 279 N.C. 254, 182 S.E.2d

403 (1971)); <u>White Plains Towing Corp.</u> v. <u>Patterson</u>, 991 F.2d
1049, 1062 (2d Cir. 1993) (citing <u>Murphy</u> v. <u>Am. Home Prods.</u>
<u>Corp.</u>, 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 237 (1983), and
<u>Haines</u> v. <u>City of New York</u>, 41 N.Y.2d 769, 773, 396 N.Y.S.2d 155,
158 (1977)).  If the Agreement between Angelou and BLP is viewed
not as a joint venture but as a simple bilateral contract, BLP
was contracting for Angelou's services as a writer and Angelou
was contracting for BLP's services as a marketer of her work;
under this view, the Agreement is a contract for services that
need not contain a provision for duration, and may be terminated
at will.[5]


    3.  <u>Subject Matter</u>

    Angelou argues that the Agreement insufficiently
defined the works she would supply to the project and the form in
which her works would be exploited.  The Agreement provides that
Angelou will "exclusively contribute original literary works
(Property) to the Venture and BLP will seek to exploit the rights
for publishing of said Property in all media forms including, but
not limited to greeting cards, stationery and calendars, etc."
(Inwald Aff., Ex. F)  The Agreement adds that Angelou will

_____

    [5]  Again, because Angelou has not moved for summary judgment
on the issue of termination (Angelou Br. at 4), the court
expresses no opinion on the issue of whether the Agreement here
was terminated, and if it was, what repercussions such
termination would have on BLP's claim against Angelou.

contribute, "on an exclusive basis, original literary works to the Venture after consultations with and mutual agreement of Butch Lewis, who will be the managing partner of the Venture." Id.

BLP claims that the Agreement's subject matter was sufficiently definite because the Agreement stated that the details of the work would be mutually agreed upon, and could not be finalized until a licensing agreement with a specific greeting card company had been reached. (BLP Br. at 19-21) Angelou claims that this admission confirms her argument that the Agreement was merely an "agreement to agree," and not a binding Agreement in and of itself. However, this court has already held that the Agreement was more than simply an "agreement to agree" -- the parties intended a binding contract here. BLP Prods., 2003 U.S. Dist. LEXIS 12655, at *28. The parties understood that they were agreeing to work together to publish Angelou's writings in greeting cards, and potentially in related media forms such as calendars and stationery. The details of the arrangement would become final as individual projects were undertaken. See Lewis Dep. at 26-35; Angelou Dep. at 26-29. When the Agreement was signed, there was a meeting of the minds as to its subject matter, and given the expressed intent of the parties, the court reasonably would be able to supply missing details, if necessary. Any omitted details are not material.

Again, BLP partially performed under the Agreement when it procured from Hallmark at least a draft that proposed the licensing of Angelou's writings for use in greeting cards and related products.  Although Angelou did not enter into this deal, neither did she question the propriety of BLP's discussions with Hallmark, or suggest that her obligations under the Agreement were too indefinite to validate those discussions.  BLP's part performance thus helps to resolve uncertainty about the Agreement's subject matter -- if there was any such uncertainty to begin with.  See 1 Corbin § 4.1 ("[T]he argument that a particular agreement is too indefinite to constitute a contract frequently is an afterthought excuse for attacking an agreement that failed for reasons other than the indefiniteness.").  Although defined in broad strokes, the Agreement's subject matter was not so indefinite as to constitute "rare and extreme" circumstances justifying invalidation of a binding contract intended by both parties.  Shann, 84 F.3d at 81.

B.  Duty of Good Faith and Fair Dealing

The above discussion of missing essential terms intersects with the issue of whether the parties here owed one another an obligation of good faith and fair dealing.  New York and North Carolina courts have held that every contract contains an implied covenant of good faith and fair dealing, in which each

party agrees not to injure the rights of the other to receive benefits under that agreement. <u>Dalton</u> v. <u>Educ. Testing Serv.</u>, 87 N.Y.2d 384, 396, 639 N.Y.S.2d 977, 984 (1995); <u>Bicycle Transit Auth., Inc.</u> v. <u>Bell</u>, 314 N.C. 219, 228-29, 333 S.E.2d 299, 305 (1985). In this case, BLP argues that each party's duty of good faith and fair dealing served to supply any missing terms relating to their respective obligations under the Agreement, and that Angelou breached her implied covenant of good faith when she failed to contribute any works to the project. (BLP Angelou Response Br., at 24, 35-36) Angelou counters that this claim duplicates BLP's breach of contract claim, and that the duty of good faith and fair dealing may not be used to force her into obligations she never intended to assume. (Angelou Reply Br. at 20-21)

### 1. <u>Duty of Good Faith and Missing Terms</u>

Then-Judge Cardozo's opinion in <u>Wood</u> v. <u>Lucy, Lady Duff Gordon</u>, 222 N.Y. 88, 118 N.E. 214 (1917), underpins the analysis here. In that case, the defendant Lady Duff Gordon, a self-styled "creator of fashions," agreed with the plaintiff Otis Wood that he would have the exclusive right, subject to her approval, to sell her designs, to license others to market them, and to place her endorsement on the designs of others. As Cardozo phrased it, "[s]he employed the plaintiff to turn this vogue into

money." Id. at 90.  Under the agreement, Lady Duff Gordon was to receive one half of "all profits and revenues" derived from contracts made by the defendant involving her work.  Id. at 90. The defendant sued Lady Duff Gordon, claiming that she had placed her endorsement on various products without his knowledge and kept the profits for herself.  Lady Duff Gordon claimed in response that the original agreement between herself and Wood was unenforceable and illusory because it failed to specify Wood's obligation to sell and market her designs.

The facts here strongly resemble those in Cardozo's classic.  As in that case, we have here an artistic defendant, a 50-50 arrangement to market her creations, and an alleged behind-the-back breach, with Ms. Angelou cast as a Lady Duff Gordon for the modern age.

In Wood, the Court held that although the contract between the parties did not spell out each party's obligations,

> [t]he law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal.  It takes a broader view to-day.  A promise may be lacking, and yet the whole writing may be instinct with an obligation, imperfectly expressed.  If that is so, there is a contract.

Id. at 91 (internal quotation marks omitted).  The Court found the implication of a binding promise between the parties from numerous aspects of the agreement.  Lady Duff Gordon gave Wood the "exclusive" right to market her creations; she must have

expected him to perform, because her business would have ceased
to exist without him. Additionally, Lady Duff Gordon's sole
compensation was to be one-half of the profits: Therefore unless
Wood made reasonable efforts under the agreement, she could
recover nothing under its terms, defeating the "business
efficacy" that both parties must have desired when they made the
agreement. <u>Id.</u> The contract between Wood and Lady Duff Gordon
was upheld, and generated a body of law in which the duty of good
faith upheld binding agreements with scant details. <u>See</u> <u>Curtis
Props. Corp.</u> v. <u>Greif Cos.</u>, 212 A.D.2d 259, 265-66, 628 N.Y.S.2d
628, 632 (1st Dep't 1995); <u>Ultra Innovations, Inc.</u> v. <u>Food Lion,
Inc.</u>, 130 N.C. App. 315, 317-18, 502 S.E.2d 685, 687 (1998); 2
Corbin § 5.27 ("The finding of implied promises is more common
today than in the era before the <u>Wood</u> case. Courts recognize
that if the parties intend a contract, rather than a nullity,
implying promises to avoid the finding of illusoriness or
indefiniteness protects the reasonable expectation of the parties
engendered by the agreement.").

Angelou claims that the Agreement is unenforceable
because it fails to define either party's obligations. She
argues that the Agreement does not specify a quantity of work to
be supplied by her, nor does it state what effort BLP was
required to expend in furtherance of the Agreement. (Angelou Br.
at 19) According to Angelou, the Agreement was so vague that she

23

could have complied with its terms and never provided any work to the project; similarly, BLP could have complied simply by making a few telephone inquiries. (Id. at 19, 23) Indeed, both Lewis and Angelou testified that Angelou was under no obligation to provide any works to the project. (Lewis Dep. at 33-35; Angelou Dep. at 34-37) Perhaps, but consider what might have occurred if Angelou had accepted some version of the proposal that Hallmark made to BLP. If Angelou had failed thereafter to contribute some works, but had published other works on her own that could have been used in greeting cards, BLP might have sued for damages stemming from Angelou's nonperformance. See United States v. Winstar Corp., 518 U.S. 839 (1996) ("Virtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance . . . ."); VTech Holdings Ltd. v. Lucent Techs. Inc., 172 F. Supp. 2d 435, 439 (S.D.N.Y. 2004) ("If a party breaches a contract, the party will be required to pay contract damages whether or not the party intended to perform the contract at the outset."); Willis Bros., Inc. v. Ocean Scallops, Inc., 356 F. Supp. 1151, 1157 (E.D.N.C. 1972).

As was the case in Wood, it appears that the parties here intended to form a binding contract. Deficiencies or gaps in the Agreement regarding the parties' obligations may be filled by the obligation of good faith that each incurred upon signing

24

it.  As in <u>Wood</u>, the profit-sharing arrangement between the
parties here meant that Angelou and BLP had nothing to gain from
the Agreement if either failed to perform or gave minimal effort.
Therefore we must assume that each party arguably had an
obligation to make "reasonable efforts" in furtherance of the
Agreement in order to vindicate the "business efficacy" that both
parties must have contemplated when they entered the Agreement.
<u>Wood</u>, 222 N.Y. at 90, 92.

        Angelou cites <u>Ginsberg</u>, 341 F.2d at 828, for the
proposition that some contractual voids are too great to fill by
implication.  In <u>Ginsberg</u>, an oral contract followed by an
exchange of letters between two businessmen for an exclusive
agency in the selling of machine labels was found unenforceable
for lack of any duration term in the agreement and other
important omissions.  The <u>Ginsberg</u> Court acknowledged <u>Wood</u>'s
"classic principle," but found too many terms missing, and held
that "the risk of ensnaring a party in a set of contractual
obligations that he never knowingly assumed [wa]s too serious."
<u>Id.</u>

        In this case, the evidence shows that Lewis and Angelou
agreed on the terms of the contract and on the meaning of those
terms.  Angelou and BLP never argued over the substance of the
Agreement, and as Lewis marketed the Angelou project to greeting
card companies, Angelou never protested.  To the contrary, she

signed a confirmation of the Agreement on June 19, 1996, which was sent to Hallmark.  (Inwald Aff., Ex. G)  Angelou did eventually refuse to deal with BLP, but this decision was not motivated by any contractual dispute.  Angelou testified that she did not like the mock-ups of the greeting cards that BLP presented to her (Angelou Dep. at 99-101), that she was disgusted by Lewis's behavior at the event in Las Vegas (Angelou Dep. at 112-116), and that she felt it was morally wrong to compromise her relationship with Random House by publishing her work elsewhere (Angelou Dep. at 215-16).  None of these reservations had anything to do with the terms of the contract Angelou signed with BLP.  Angelou articulated no concerns about the nature or scope of the Agreement, and did not complain that she had been ensnared into contractual obligations she had unknowingly assumed.  Angelou's plight does not resemble that of the merchant in <u>Ginsberg</u> who made an oral contract and signed an informal letter confirming a vague arrangement.  Her case more closely parallels that of Lady Duff Gordon, who signed a binding agreement that she later came to regret.

The repeated use of the language of exclusivity in the dealings between Angelou and BLP is further evidence that each party had a good faith obligation to perform under the Agreement. The Agreement twice uses the word "exclusive" in describing Angelou's contributions to the "Venture" -- "Angelou will

exclusively contribute original literary works," and "Angelou

will contribute, on an exclusive basis, original literary works"[6]

-- and in the letter sent by Angelou and BLP to Hallmark on June

19, 1996, Angelou stated that BLP had the "exclusive right" to

represent her "for the exploitation of her work product in the

area of greeting cards, stationery, calendars, etc."[7]  This court

held previously that the parties did not contemplate an exclusive

agency in their Agreement -- instead, they set out to form a

joint venture, but did so improperly.  See BLP Prods., 2003 U.S.

Dist. LEXIS 12655, at *44-*46.  Lewis denied repeatedly that he

was Angelou's exclusive agent (Lewis Dep. at 36-38), and instead

insisted that the two were "partners."  But even if the

arrangement Angelou and Lewis entered into could not be described

as an agency, the Agreement and the June 19, 1996 confirmation

letter both show that the parties intended to work with one

another on the greeting card project, and Angelou promised that

she would provide her work for use in greeting cards exclusively

to BLP.  This language is further evidence that the parties

assumed that each would act in good faith to further the

Agreement.  As in Wood, "[w]e are not to suppose that one party

was to be placed at the mercy of the other," 222 N.Y. at 91;

rather, Angelou committed to work only with BLP to accomplish her

---

[6]  Inwald Aff., Ex. F.

[7]  Inwald Aff., Ex. G.

contractual goal, and trusted that BLP would fulfill his
obligations under the Agreement.

As discussed above,[8] and bearing in mind that the court
must construe all evidence in the light most favorable to the
nonmoving party, the Agreement at least arguably contains most if
not all required essential terms for enforcement.  Any remaining
vagueness or uncertainty regarding the parties' obligations may
be found immaterial, because the parties' reciprocal duty of good
faith under the Agreement ensured that they would make reasonable
efforts to perform.

### 2.  Duty of Good Faith as a Separate Cause of Action

As discussed above, the duty of good faith can
compensate for vagueness in a binding agreement so as to prevent
invalidation of a contract clearly intended by the parties.
However, under New York law, because the covenant of good faith
and fair dealing is "part and parcel" of the underlying contract,
Boscorale Operating, LLC v. Nautica Apparel, Inc., 298 A.D.2d
330, 331, 749 N.Y.S.2d 233, 234 (1st Dep't 2002), a party does
not have a separate cause of action for breach of the covenant of
good faith and fair dealing based on the same facts as the breach
of contract claim.  See Hall v. EarthLink Network, Inc., 396 F.3d
500, 507-08 (2d Cir. 2005); Canstar v. J.A. Jones Constr. Co.,

---

[8]  See supra Part II.A.

212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 731 (1st Dep't 1995) (citing <u>Fasolino Foods Co.</u> v. <u>Banca Nazionale del Lavoro</u>, 961 F.2d 1052, 1056 (2d Cir. 1992)).  Although some courts in North Carolina have considered good faith and fair dealing claims separate from breach of contract claims, <u>see, e.g.</u>, <u>Eli Research Inc.</u> v. <u>United Communications Group, LLC</u>, 312 F. Supp. 2d 748, 761 (M.D.N.C. 2004), the weight of North Carolina authority holds also that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately.  <u>See, e.g.</u>, <u>Shalford</u> v. <u>Shelley's Jewelry, Inc.</u>, 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000) (citing <u>Polygenex Int'l, Inc.</u> v. <u>Polyzen, Inc.</u>, 133 N.C. App. 245, 251, 515 S.E.2d 457, 461-62 (1999)); <u>Mech. Indus.</u> v. <u>O'Brien/Atkins Assocs., P.A.</u>, No. 97 Cv. 99, 1998 U.S. Dist. LEXIS 5389, at *11 (M.D.N.C. Feb. 4, 1998) (noting that North Carolina recognizes a separate cause of action for breach of good faith and fair dealing only in limited circumstances involving special relationships between the parties, such as cases involving funeral services and insurance contracts).

        BLP does not allege that its good faith and fair dealing claim is based upon any facts other than those supporting its breach of contract claim.  (Am. Compl ¶¶ 28-30)  BLP's separate cause of action for breach of the covenant of good faith

and fair dealing therefore is dismissed as duplicative of its breach of contract claim.

## C. Causation, Damages, and Termination

The issues of whether Angelou's actions caused the alleged breach of contract and whether BLP suffered any damages from the alleged breach are not raised in Angelou's motion, and Angelou specifically disclaims any intention to seek summary judgment now on the issue of whether she terminated the alleged contract before any breach. (Angelou Br. at 4) Her motion argues only that the Agreement did not constitute an enforceable bilateral contract. As explained above, that motion is denied. Therefore, there is no need to discuss whether, if Angelou terminated the Agreement before the alleged breach, BLP's claims for breach of the implied covenant of good faith and fair dealing or quantum meruit recovery might be resurrected.[9]

### III.

Hallmark moves for summary judgment on BLP's claim for

---

[9] Cf. Swinton v. Safir, 93 N.Y.2d 758, 763, 697 N.Y.S.2d 869, 871 (1999) (holding that a probationary employee could be terminated at will but only absent a showing that he was dismissed in bad faith or for an improper or impermissible reason); Aniero Concrete Co. v. New York City Constr. Auth., Nos. 94 Civ. 9111 and 95 Civ. 3506, 2000 U.S. Dist. LEXIS 8833, at *27-*35 (S.D.N.Y. 2000) (explaining that quantum meruit recovery is available only in the absence of an enforceable contract).

tortious interference with contract.  In its amended complaint,

BLP claims that after July 19, 1996, Hallmark was aware that BLP

had the exclusive right to represent Angelou in any deal

involving the publication of her work in greeting cards and

related products.  (Am. Compl. ¶ 21)  BLP alleges that Hallmark

induced Angelou to breach her agreement with BLP, and that BLP

suffered damage thereby.  Id. ¶¶ 37-38.

Under New York law,[10] tortious interference with

contract requires the claimant to prove the following four

elements: "(a) that a valid contract exists; (b) that a third

party had knowledge of the contract; (c) that the third party

intentionally and improperly procured the breach of the contract;

and (d) that the breach resulted in damage to the plaintiff."

Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001) (internal

quotation marks omitted).

As discussed above, there is at least an issue of

material fact as to the first element of BLP's tortious

interference claim against Hallmark -- whether a contract existed

between BLP and Angelou.  The remaining three elements are

treated below.

_____

[10]  Hallmark and BLP agree that New York law applies to
their dispute.

A.  Hallmark's Knowledge

Hallmark claims that it had no knowledge of the terms of the Agreement between BLP and Angelou.  When Hallmark became interested in negotiating a licensing deal with Angelou in 1996, it asked Lewis for proof that BLP had the authority to act on Angelou's behalf.  (Farrell Dep. at 249, Mitchell-Layton Dep. at 27-30)  Lewis did not send the November 22, 1994 Agreement to Hallmark because he wanted to keep its terms confidential (Lewis Dep. at 118-19); instead, on June 19, 1996, Lewis sent Hallmark a statement signed by Angelou confirming that Lewis had the "exclusive right" to represent Angelou "for the exploitation of her work product in the area of greeting cards, stationery, calendars, etc. as per the contract executed by BLP and Dr. Angelou dated November 22, 1994 which is still in full force and effect."  (Inwald Aff., Ex. G)  Hallmark claims that this letter did not give it sufficient knowledge of the contract between BLP and Angelou to sustain BLP's tortious interference claim.

Under New York law, however, BLP need prove only that Hallmark knew of the existence of the contract.  "That knowledge need not have been perfect or precise," nor must Hallmark "have been aware of the legal particulars of the contract."  Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc., 241 F. Supp. 2d 246, 279 (S.D.N.Y. 2002) (internal citation omitted); see also Bishop v. Porter, No. 02 Cv. 9542, 2003 U.S. Dist. LEXIS 7625, at

*20-*21 (S.D.N.Y. May 8, 2003) (holding that knowledge of a specific contract is the minimum requirement for a tortious interference claim); <u>Don King Prods.</u> v. <u>Douglas</u>, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) ("It is enough that the defendant who interfered have knowledge of the <u>existence</u> of the contract, which itself may suffice to imply malice.") (internal quotation marks omitted); <u>Guard-Life Corp.</u> v. <u>S. Parker Hardware Mfg. Corp.</u>, 50 N.Y.2d 183, 193, 428 N.Y.S.2d 628, 634 (1980) ("While it must be established, as a threshold predicate for any claim of tortious interference, that the alleged tort-feasor knew that his competitor had a contract with the third party, as a practical matter he will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract . . . ."); Restatement (Second) of Torts § 766, comment *i* (1979).

Hallmark cites several cases from other jurisdictions for the proposition that general knowledge of a contract's terms is not sufficient to satisfy the knowledge prong of a tortious interference claim. (Hallmark Br. at 14-15) However New York law takes the opposite position, as is apparent from the above authorities. Here, although Hallmark indeed was unaware of the terms of the contract between BLP and Angelou, it did have formal written notice of a contract between those parties that gave BLP the "exclusive right" to negotiate a licensing deal for greeting

cards with Hallmark on Angelou's behalf.[11]  No more detailed

notice was required.  There is at least a jury issue as to

whether Hallmark had such knowledge of the Agreement as would

sustain BLP's tortious interference claim on that ground.


B.  Inducement of Breach

Hallmark claims also that BLP cannot prove that it

intentionally brought about Angelou's alleged breach of the

Agreement.  Citing conflicting New York authorities, the parties

dispute whether "but for" causation must be proved in order to

satisfy the inducement prong of BLP's tortious interference

claim.  (Hallmark Br. at 16, BLP Response Br. at 15-16)  <u>See</u>

<u>Astor Holdings</u> v. <u>Roski</u>, 325 F. Supp. 2d 251, 259 & n.5 (S.D.N.Y.

2003) (noting the split of authorities on whether "but for"

causation must be proved in addition to proximate causation to

support a tortious interference claim).  However, under either a

"but for" or a proximate causation standard, BLP has raised

_____

[11]  It is irrelevant to this motion that Lewis denied that he
was Angelou's exclusive agent (Lewis Dep. at 36-38), and that
this court held that no formal exclusive agency existed between
Angelou and BLP, <u>B. Lewis Prods.</u>, 2003 U.S. Dist. LEXIS 12655, at
*44-47.  Hallmark was on notice that there was a contract in
effect between BLP and Angelou at the time of the alleged
tortious interference.  Whether that contract met the
requirements of an agency agreement or whether it was legally
binding does not affect BLP's claim.  <u>See</u> Restatement (Second) of
Torts § 766, comment _i_ (an individual is subject to liability for
tortious interference even if he or she "believes that the
agreement is not legally binding or has a different legal effect
from what it is judicially held to have.").

issues of material fact as to whether Hallmark improperly and intentionally induced Angelou's alleged breach of contract.

Angelou did not express a desire to make a licensing deal with Hallmark until she met with Hallmark executives in Kansas City in June 1999.  Angelou was invited to this meeting by her close friend Amelia Parker, who was acquainted with a Hallmark executive by the name of Marquetta Glass.  (Parker Dep. at 29-30, 49)  In preparation for this meeting, Parker and Glass exchanged letters discussing a potential licensing arrangement between Angelou and Hallmark (Eisenstein Exs. 12, 17), and Parker and Angelou worked together to develop "a strategy to bring closure to the Lewis matter."  (Eisenstein Ex. 12; Angelou Dep. at 279-80)  Hallmark hired Parker as a consultant to help make a deal with Angelou (Eisenstein Ex. 15), and in reporting her services for the period between May and September 1999 to Hallmark's director of licensing, Parker noted that she had consulted on  "[l]egal strategy to void greeting cards agency of previous Angelou representative."  (Eisenstein Ex. 14)  On June 16, 1999, after the meeting between Angelou, Parker, and Hallmark executives, Angelou's North Carolina counsel allegedly sent a letter to Lewis giving "formal notice" that "any business relationship" that had been contemplated pursuant to the November 22, 1994 letter was terminated.  (Weiner Aff., Ex. U)  In June 2000, Angelou entered into a licensing agreement with Hallmark

and of course did not offer BLP any share of her profits from that agreement.[12]

Although circumstantial, the above evidence is enough for a reasonable jury to conclude that Hallmark knew about the contract between BLP and Angelou, and deliberately engaged Parker to help Angelou disentangle herself from that disadvantageous[13] relationship. Hallmark insists that Angelou's stated reasons for ending her association with Lewis -- that she did not like the product, was offended by Lewis's conduct, and did not want to compromise her book publishing deal -- had nothing to do with its actions. But a jury reasonably could conclude that until Hallmark initiated contact with Parker, Angelou was content to continue her Agreement with BLP, and but for its advances, she would not have allegedly breached that Agreement. A material issue of fact therefore exists as to whether Hallmark intentionally and improperly induced Angelou to breach her contract with BLP.

---

[12] Hallmark argues that because Angelou terminated her Agreement with BLP in 1999, it could not have induced Angelou to breach that Agreement by inducing her to enter into a licensing agreement in 2000. (Hallmark Reply Br. at 5) However Lewis denied ever receiving Angelou's termination letter (Lewis Dep. at 159-161). The issue of whether Angelou's June 19, 1999 letter to Lewis actually terminated the November 22, 1994 Agreement has not been briefed by the parties, and cannot be dispositive here.

[13] Parker told Angelou that Glass had referred to the "tidal wave of angst" caused by Lewis's negotiations with Hallmark. (Eisenstein Ex. 17)

C. Damages

        Finally, Hallmark argues that BLP suffered no damages
from the alleged tortious interference.  Hallmark notes that it
did nothing to prevent BLP from recovering its 50 percent share
of Angelou's compensation under the 2000 licensing agreement.
(Hallmark Br. at 19-20)  BLP counters that it suffered damages
for loss of the goodwill that it would have accrued for bringing
about the deal between Angelou and Hallmark, and for loss of the
ability to promote the project and generate increased royalties,
50 percent of which it would have received under the Agreement.
(BLP Hallmark Response Br., at 17-18)

        As Hallmark correctly argues (Hallmark Reply Br. at 6-
7), BLP has not made out a sufficient claim for damages stemming
from loss of goodwill.  See Toltec Fabrics, Inc. v. August Inc.,
29 F.3d 778, 780-82 (2d Cir. 1994) (holding that to state a claim
for loss of goodwill, a party must (1) make a nonspeculative
showing of loss, (2) present objective proof of the amount of
that loss, and (3) show that the loss was directly caused by the
opposing party's actions).  BLP has presented no objective proof
of loss of goodwill resulting from Hallmark's alleged tortious
interference, and therefore its allegation of damages may not be
sustained on that ground.

        However, viewing the facts in the light most favorable
to the nonmovant, BLP's claim that Hallmark's interference

deprived it of the ability to promote the Angelou project and
thereby collect royalties could form a nonspeculative basis for
damages. Lewis is a successful sports and entertainment promoter
who might have had unique resources unavailable to Hallmark.
Moreover, although Lewis does not so argue, a reasonable jury
could see Hallmark's alleged tortious interference as an
important link in the chain that brought about Angelou's formal
rupture with Lewis. Thus, Hallmark's actions may have prevented
Lewis from recovering his 50 percent share under the Agreement.
At this stage of the proceedings, significant issues of material
fact remain as to the amount of damages BLP suffered as a result
of Hallmark's alleged tortious interference.

Therefore Hallmark's motion for summary judgment
dismissing BLP's tortious interference claim is denied.

\*     \*     \*

For the reasons set forth above, both motions for
summary judgment are denied.

SO ORDERED:

Dated:  New York, New York            Michael B. Mukasey,
        April 26, 2005                U.S. District Judge